# EXHIBIT D

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| DAVID GEORGE WILLIAMS, an individual, on behalf of the State of California, as a private attorney general, and on behalf of all Aggrieved Employees,<br><br>Plaintiff,<br><br>vs.<br><br>AMAZON.COM SERVICES LLC, a Delaware Limited Liability Company; DOES 1 to 50, inclusive,<br><br>Defendants. | No. 3:22-CV-1892-VC |

CONFIDENTIAL

REMOTE DEPOSITION OF 30(b)(6) AMAZON.COM SERVICES LLC

KATIE HUGHES

Seattle, Washington

Friday, August 5, 2022

Volume I

Reported by:
SHARON LINDSAY-MILNIKEL
CSR No. 5335
Job No. 5332898

PAGES 1 - 83

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

DAVID GEORGE WILLIAMS, an individual, on behalf of the State of California, as a private attorney general, and on behalf of all Aggrieved Employees,

Plaintiff,

vs. No. 3:22-CV-1892-VC

AMAZON.COM SERVICES LLC, a Delaware Limited Liability Company; DOES 1 to 50, inclusive,

Defendants.

Confidential remote deposition of 30(b)(6) AMAZON.COM SERVICES LLC KATIE HUGHES, Volume I, taken on behalf of the Plaintiff, the Putative Class, the LWDA, and the other Aggrieved Employees, at Seattle, Washington, beginning at 1:01 p.m. PST and ending at 2:46 p.m. PST on Friday, August 5, 2022, before SHARON LINDSAY-MILNIKEL, Certified Shorthand Reporter No. 5335.

Page 2

APPEARANCES:

For Plaintiff, the Putative Class, the LWDA, and the other Aggrieved Employees:
ACKERMANN & TILAJEF
BY: CRAIG J. ACKERMANN
Attorney at Law
1180 South Beverly Drive, Suite 610
Los Angeles, California 90035
(310) 277-0614
cja@ackermanntilajef.com

JOSHUA KLUGMAN, ATTORNEY AT LAW
BY: JOSHUA KLUGMAN
Attorney at Law
1180 South Beverly Drive, Suite 610
Los Angeles, California 90035
(424) 248-5148
esquirejosh@yahoo.com

Page 3

APPEARANCES (Continued):

For Defendant Amazon.com Services LLC:
GIBSON, DUNN & CRUTCHER
BY: LAUREN M. BLAS
BY: AMANDA R. SANSONE
Attorneys at Law
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000
lblas@gibsondunn.com
asansone@gibsondunn.com

Also Present:
JACLYN BLACKWELL
MILTON GAO
DAVID WILLIAMS

Page 4

INDEX


| WITNESS | EXAMINATION |
|---|---|
| KATIE HUGHES | |
| VOLUME I | |
| BY MR. ACKERMANN | 6 |


EXHIBITS


| NUMBER | | PAGE |
|---|---|---|
| Exhibit 12 | Document entitled "Information-regarding-the-2019-Novel-Coronavirus-global" | 25 |
| Exhibit 13 | Document entitled "Amazon's COVID-19 blog" | 41 |
| Exhibit 14 | Document entitled "Amazon updates return-to-office guidance" | 59 |
| Exhibit 15 | Document entitled "Ongoing company updates regarding COVID-19 (2019 Novel Coronavirus)" | 67 |
| Exhibit 16 | Document entitled "Working in the Office" | 71 |


Page 5

Seattle, Washington, Friday, August 5, 2022
1:01 p.m. PST

KATIE HUGHES,

having been administered an oath, was examined and testified as follows:

EXAMINATION

BY MR. ACKERMANN:

Q Good afternoon, Ms. Hughes.
My name is Craig Ackermann and I'm lead counsel for David Williams and the putative class of California office employees for Amazon who have been working from home since March of 2020. I'm going to be taking your deposition this afternoon.
Have you ever had your deposition taken?
A I have not.
Q Okay. So could you please -- let's start out, if you could just state and spell your name for the record.
A Sure.
Katie Hughes, K-a-t-i-e, last name, Hughes, H-u-g-h-e-s.
Q Okay. The court reporter was kind enough to swear you in.



Do you understand that your testimony today has the same force and effect as you are testifying in court?
A I do.
Q Okay. And since the court reporter is going to be taking a transcript of my questions and your answers, as a courtesy, if you would allow me to finish my questions before answering and I'll extend the same courtesy to you of allowing you to answer before I pose my next question. That will help the court reporter a lot.
Is that agreeable?
A Agreed.
Q Similarly, if I ask a question that's confusing or that you don't understand, please ask me to clarify it or restate it. I will be happy to do so. If you answer a question I pose, I'm going to assume you understood it.
Is that fair?
A Fair.
Q Okay. Any reason you can't give your best testimony today?
A No.
Q Okay. What did you do to prepare for your deposition today?



A I met with counsel.
Q Okay. Did you review any documents?
A Two.
Q Okay. Which documents?
A The interrogatories and requests for admission.
Q Okay. Anything else?
A I believe there were some blog posts from the Amazon Day One blog.
Q Okay.
A And some Inside Amazon pages.
Q Okay. Inside Amazon pages, are those like policy documents?
A The guideline documents that were employee-facing.
Q Okay. Anything else?
A I think there were some e-mails, some office safety e-mails but I think that was it.
Q Okay. All right. And other than your lawyer, did you speak with any -- anybody else prior to your deposition today?
A No.
Q And because this deposition is being taken by Zoom, I just need to insist if you have a cell phone or another device that you're able to receive



and send texts, please either turn that off or just confirm that it's not within reaching distance. That way I can make sure I'm getting your testimony.
Is that okay?
A Perfect.
Q All right. Could you describe your educational background for the record.
A Sure.
I attended Seattle University and got my bachelor's degree from Seattle U.
Q Okay. And what year was that?
A I graduated in '07.
Q And what's your bachelor's in?
A Psychology and sociology.
Q Okay. And could you describe your employment history prior to Amazon.
A I worked at a maritime law firm here in Seattle as a litigation paralegal. And then prior to that, I was at a criminal defense law firm in Seattle as well.
Q And was that also a paralegal position?
A Yeah, a legal assistant --
Q Okay.
A -- moved to paralegal, yeah.

MS. BLAS: Okay. Okay.
MR. ACKERMANN: -- if this should have been doubled, just let me know or submit a supplemental response. It may not change anything because, you know, Internet bills are monthly, maybe that's the confusion. But it was asking about pay periods which is --
MS. BLAS: I know --
MR. ACKERMANN: -- typically --
MS. BLAS: -- we understood it -- our understanding -- well, I'm not going to testify, but we didn't misunderstand the question.
MR. ACKERMANN: Okay. I mean if it's correct, it's correct. That's fine.
Q All right. Do you know, Ms. Hughes, sitting here today, the 153,417 months that we were referring to there as the total months subject to the work from home, do you know, is that coextensive with what Amazon has referred to as the corporate-advised work-from-home period?
MS. BLAS: Object to form, to the extent it calls for speculation, lacks foundation.
BY MR. ACKERMANN:
Q Yeah, are you familiar with the term corporate-advised work-from-home period?



A I am familiar that that is used; however, I don't believe that there is actually a corporate-advised work-from-home policy.
Q Okay. Well, we went over this morning some documents that used that language; for example --
If we can just pull up, Jaci, Exhibit 7.
-- I'm showing you what was previously marked this morning as Exhibit 7, Ms. Hughes. It's a document produced by counsel for Amazon in this case regarding expense reimbursements and with the header "Most Common Expense Reimbursement Questions regarding COVID-19."
Have you ever seen this before?
A I have.
Q Yeah.
So just in terms of the second question down where it says:
"I incurred incremental internet or extra mobile phone costs as a result of working from home, will Amazon reimburse for these costs," at the
end of the first paragraph there on the answer, the last sentence says:
"These temporary internet and mobile



phone claims are only applicable during the corporate advised work from home period (sic)."
Do you see that?
A I do.
Q Okay. So do you have an understanding as to what that term means within the world of Amazon?
A It's not generally used. I will believe that this is probably legacy or outdated language being used here.
Q Okay. So do you know if the corporate-advised work-from-home period is coextensive with the period from March of 2020 until the present?
MS. BLAS: Objection. Calls for speculation, vague.
THE WITNESS: I believe there's no corporate-advised work-from-home period.
BY MR. ACKERMANN:
Q Okay. Well, would it surprise you to learn that that language appears in a number of iterations of this document that prior deposition testimony from an Amazon witness has indicated was up on Amazon's wiki page?
A I'm not too surprised but --
Q Okay.



A -- yes -- yeah.
Q So just speaking for you personally, you're not aware of what this corporate-advised work-from-home period refers to --
A No, I'm not.
Q -- is that correct?
A Correct.
Q Okay. And am I correct -- I believe you testified earlier you've been designated to testify on Topic 5, which is an Amazon document entitled "Information-Regarding-the-2019-Novel-Coronavirus-global"; is that right?
A That is correct.
MR. ACKERMANN: Jaci, can we bring that up. I think this will be Exhibit 12.
(Exhibit 12 was marked for identification by the court reporter and is attached hereto.)
MS. BLACKWELL: My apologies, Craig, can you confirm which document you're talking about.
MR. ACKERMANN: It's AMZN Bates-numbered -64 through -65.
MS. BLACKWELL: Got it. Thank you. One second.
THE REPORTER: Mr. Ackermann, could I ask you to slow down a little bit for me.

MR. ACKERMANN: Sure, I'm sorry.
THE REPORTER: Thank you.
MR. ACKERMANN: I'm going to talk like I'm back in Texas.
THE REPORTER: That would be great.
MR. ACKERMANN: Because, you know, not all us cowboys talk fast, some of us know how to talk slow too.
THE REPORTER: Show me.
MR. ACKERMANN: Okay.
Oh, that's way too small, Jaci. Wow.
Q Okay. All right. What we're putting on the screen -- we'll try to expand it as much as we can, Ms. Hughes -- is a document entitled "Information-regarding-the-2019-Novel-Coronavirus-global."
Can you identify this as an Amazon document regarding COVID-19 and ongoing company updates regarding COVID-19, a two-page document Bates-numbered AMZN -64 through -65?
A Correct.
Q Okay. And have you seen this document before?
A I have.
Q All right. Do you know when it was



created?
A I am unsure of this one in particular. I believe this one must have been in the June time frame.
Q And is that because at the top there it says "modified June 2nd, 2020?
A That helps.
Q Okay. All right. And how, if at all, were Amazon's employees advised about the existence of Exhibit 12?
A On our main page for all Amazon information, news, et cetera, there was a banner up top that said "Ongoing company updates regarding COVID-19." If you clicked on that banner, it took you to these updates and these pages.
Q Okay. And is that -- is that the same thing as the wiki page or is that something different?
A It's different.
Q Okay. Where is this page located?
A This is in our main internal company hub page. So if you were to go to like "Home" for Amazon, it goes to this main page.
Q Okay. And do you see over here the section entitled "Overview"? And it says:



"The health of our employees is our top priority. This page provides global guidance to Amazonians regarding what employees need to know related to COVID-19"? Do you see that?
A Yes.
Q And then in the next sentence -- here, I'm going to try to slow down -- it says:
"Public information regarding the company's response to COVID-19 and how we're supporting our employees, customers and communities can be found here on The Amazon Blog: Day One," and there's like, I guess, a link there --
A Yes.
Q -- is that the COVID-19 blog -- is that the same thing as Amazon's COVID-19 blog?
A Yes.
Q So employees were advised by Amazon that if they wanted information about sort of Amazon's response to COVID-19, they should look at that blog, correct?
MS. BLAS: Objection. It misstates the



document, misstates testimony.
You can answer.
BY MR. ACKERMANN:
Q It's okay.
A Yes, it was another resource available to employees to get information on COVID-19 response --
Q Yeah.
A -- responses, yeah.
MR. ACKERMANN: Jaci, could you just move the document to the left so we can see. Yeah. Okay.
Q And then under the header "Top Things Amazonians Should Know" -- I assume "Amazonians" is how you guys refer to Amazon employees; is that right?
A That's correct.
Q Okay. So number 1 there says:
"Working from home - Employees who work in a role that can effectively be done from home are welcome to do so until at least October 2. We will continue to evaluate the situation and update this page as needed."
Do you see that language?

A I do.
Q Okay. So was it your understanding that Amazon had recommended employees to work from home beginning in or around March of 2020?
A There was a recommendation that employees who were able to work from home were recommended to do so at the beginning of March.
Q Okay. And then do you see a little bit lower down it has a section "Workplace options"?
A Yep.
Q It's got a header there at the top --
And then, Jaci, can you scroll down the page.
-- it says number 1, "Workplace Options and Returning to the office FAQs."
Do you see that?
A Yep.
Q And Q1 asks:
"Can I keep working from home when local governments lift 'stay at home' orders?"
And then, underneath, it says:
"Yes. Employees who work in a role that can effectively be done from home are welcome to do so until at



least October 2."
So was that Amazon's policy, that even after the --
MS. BLAS: Object to form.
MR. ACKERMANN: Excuse me? Let me just finish the question.
MS. BLAS: Sure.
BY MR. ACKERMANN:
Q So was it Amazon's policy that even after the government stay-at-home orders were lifted, Amazon advised workers that they could continue working from home until at least October 2nd?
A I don't -- it was not a policy --
MS. BLAS: Object to form.
THE WITNESS: Sorry, I lost the question. Could you please repeat it.
MR. ACKERMANN: Sure.
Q I'm sorry, I was just asking if that was Amazon's policy, that even after the stay-at-home orders were lifted, employees whose roles could be done effectively from home were told that they were welcome to continue working from home and that the company had authorized that?
A It was a varying degree by employee. So employees were welcome to continue to work from



home, but it was not actually a policy. This was more guidance. It was really team-dependent and their ability to effectively work from home.
Q Okay. All right. And then scrolling down a little bit more, do you see where it says, number 2, "Working from home FAQs"?
A Yup.
Q And Q5 over there asks:
"What best practices or tips are available to help me while working from home?"
The document says:
"Read tips, tools, and best practices curated from a variety of internal teams," et cetera.
Q6: "What should I do to ensure a secure work environment while working from home."
Is that -- is that asking in terms of the security of access to Amazon's networks and computer systems?
A Correct.
Q Okay. And would it -- would it be accurate to say that Amazon was very concerned if employees were working remotely, that they did so



in a way that would secure the integrity of its networks and -- and systems?
MS. BLAS: I'll object to the extent it's outside the scope and vague.
She can answer if she knows.
THE WITNESS: I am unsure.
BY MR. ACKERMANN:
Q Okay. Well, for example, below there, in response to Q6, it gives certain advice and it tells people not to discuss confidential work in any public places, correct?
A Correct.
Q Okay. So was it Amazon's preference during the -- let's say, was it the company's guidance, during the work-from-home period, that individuals really should be in their homes specifically as opposed to public places because that would be more secure?
MS. BLAS: Objection. Vague, calls for speculation.
You can answer.
THE WITNESS: I don't believe there was -- I'm unsure that is the position they were taking.
BY MR. ACKERMANN:
Q Okay. All right. And then Q7 asks:

"How can I create an ergonomic workspace at home."

I assume Amazon provided some advice to people about how to have a healthy work environment while they're working from home there; is that correct?

A That is correct.

Q Okay. And then it says:

"What computer can I take home from the office?" That's Q9.

Let's just scroll to the next page.

So corporate employees were welcome to take home some computer equipment, including "keyboard, mouse, docking station, computer cables, and select non-mounted monitors"; is that correct?

A That's correct.

Q And then Q10:

"How do I connect to the network while working remotely?"

Is the "network" referred to there Amazon's computer networks?

A That's correct.

Q Okay. And then it says -- answer:

"You need two things to connect to the Amazon network from home: A registered USB key, and a Midway PIN. Learn more in the 'Connect to VPN' and 'Working Remotely' articles on it.amazon.com."

Do you see that language?

A I do.

Q Okay. So were Amazon's workers all assigned a -- those type of workers who needed access to the network, were they all assigned a USB security key and a Midway PIN?

MS. BLAS: Objection --

THE WITNESS: All --

MS. BLAS: Lacks foundation, calls for speculation.

But you can answer.

THE WITNESS: All employees, regardless of working from home, are given a security key and Midway PIN.

BY MR. ACKERMANN:

Q Okay. But those are all tech employees -- right -- I mean a janitor wouldn't be given that, correct?

A All corporate employees --

Q Okay.

A -- not specifically tech, corporate office employees.

Q Okay. I understand.

So if somebody was working remotely, they would need this USB security key and the Midway PIN in order to access Amazon's network from home, correct?

A Correct.

MS. BLAS: I'll object. It's outside the scope and calls for speculation.

BY MR. ACKERMANN:

Q Okay. You can answer.

A Correct.

Q Okay. Do you know if this document still appears on Amazon's hub?

A We --

MS. BLAS: Objection. Vague.

THE WITNESS: We still have a COVID-19 page --

BY MR. ACKERMANN:

Q Okay.

A -- it has been updated and modified several times since this June date.

Q Okay. Do you know if the version that's currently up on the hub has been produced to your counsel and if they produced it to us in this case?

A I am unaware.

Q Okay. And if you look down at Q20, under "Hiring and Transfers FAQs," it appears to me that Amazon had a policy not to allow relocation of workers, I guess, during the COVID-19 pandemic -- and I'm getting that from Q20, the second sentence there -- "At this time, relocation or travel for internal transfers that is not deemed 'critical' is not approved due to ongoing COVID-19 developments."

So is it accurate to say that during the COVID-19 pandemic, Amazon kind of had a more or less blanket rule that it did not approve employees relocating or transferring?

MS. BLAS: I'll object it misstates the document, calls for speculation. Lacks foundation.

BY MR. ACKERMANN:

Q You can respond.

A I am unsure. I do know there were several concerns with people moving away from their office locations due to tax reasons.

Q Okay. So, as a general policy, Amazon wanted people to stay at their I guess -- basically wherever they had been living before, Amazon's preference was -- or guidance was that people

should continue to work from those locations, correct?
A I think --
MS. BLAS: Objection. Vague, calls for speculation, assumes facts.
THE WITNESS: I think it was employee-unique -- unique to each employee and their circumstance. I don't think it was broadly set.
BY MR. ACKERMANN:
Q Well, wasn't -- I mean wasn't the general work-from-home policy that during COVID, especially when there were stay-at-home orders, but even afterwards, that Amazon recommended employees to work from their homes, wasn't that the policy?
A It wasn't a policy. It was -- it was a guideline only because there are several roles, even in the corporate and office setting, where work can't be done from home.
So it was really up to each individual team and their unique needs and also up to employees and their ability to effectively work from home.
Q Right. And what's the difference between a guidance and a policy in your view?
MS. BLAS: I'll object that that calls for



a legal conclusion --
Go ahead.
-- and outside the scope.
But she can answer.
THE WITNESS: We had everything related to COVID as guidance, which was obviously hard in our unique position as we are a global company with multiple different business units inside. So our guidance were essentially guardrails that were placed, but each team had to make their own decision and determination for what worked best for them, getting their work done and for their employees.
BY MR. ACKERMANN:
Q Okay. And what types of jobs had to be done in the office, are those things that were hands-on or that required team collaboration in person?
MS. BLAS: Objection. Vague, lacks foundation, calls for speculation, outside the scope of the notice.
But she can answer.
THE WITNESS: There are several jobs that required in-office work, laboratory, R&D space.
We have a lot of secure locations that



work on government contracts where they have to be in a specific spot.
Things like our horticulture team, obviously, the plants -- there are corporate workers, the plants have to get watered.
So it just depended on the team, the exact work that they were doing, and the ability to continue to progress as a team physically on-site so they might need equipment.
BY MR. ACKERMANN:
Q Okay. And I think I read on the blog -- we'll get to it in a little bit, but I believe I read that 90 percent of Amazon's corporate office employees were working remotely from home and not in the office setting during COVID.
Is that consistent with your understanding?
A It varied --
MS. BLAS: Objection. It misstates the document.
But go ahead.
THE WITNESS: It varied by country, region, team, building, so --
BY MR. ACKERMANN:
Q Okay. What about in California?



A Still varied --
MS. BLAS: Objection --
THE WITNESS: Oops. Sorry.
MS. BLAS: Sorry, please wait for me to object.
You can answer.
THE WITNESS: It varied, even in California, by team, city, state, building, location.
BY MR. ACKERMANN:
Q Okay. All right. So I want to ask you about Topic 6 in the 30(b)(6) notice. Those are the "Entities on Amazon's COVID-19 Blog Regarding Working from Home and Returning to the Office."
I guess the easiest way is to just bring up the document as a whole and we can kind of scroll through it.
So, Jaci, can you bring that up. It will be Exhibit 13.
(Exhibit 13 was marked for identification by the court reporter and is attached hereto.)
MR. ACKERMANN: Let's expand it to a 100 percent.
Q All right. I'm putting on the screen what's been marked as Exhibit 13 and I believe this





Veritext Legal Solutions
866 299-5127

is a 148-page document entitled "Amazon's COVID-19 blog."
Have you seen this document before?
A I have.
Q Okay. And does this document contain updates from Amazon during the COVID-19 pandemic?
A Correct.
Q Okay. And my understanding is it says on the first page there, under the date, "Last updated," that it's "Written by Amazon Staff."
Do you know who wrote this?
A I think it varies, so no.
Q Okay. And is there a vetting process for material to appear on this blog?
A Yes.
MS. BLAS: Vague.
THE WITNESS: Oh.
MS. BLAS: Excuse me.
BY MR. ACKERMANN:
Q Go ahead.
A Yes.
Q Okay. So, for example, Amazon would not intentionally put incorrect information on this blog; is that right?
A Correct.



Q And would you agree that information on the blog is -- is accurate to the extent that Amazon vetted it?
MS. BLAS: Objection --
THE WITNESS: Yes, I would --
THE REPORTER: Ms. Hughes, wait for counsel's objection. Please pause for a second.
I didn't get the full objection, Ms. Blas.
MS. BLAS: Objection. Vague.
THE REPORTER: Thank you.
BY MR. ACKERMANN:
Q And did you say I would -- I would agree?
A Yes.
Q Okay.
If we could scroll all the way down to the first blog entry, Jaci. That would be February 28th of 2020. I think it's on page 145 of the PDF.
Okay. So the first blog entry appears to be February 28th.
I assume that would have been of 2020, correct?
A That is correct.
Q Okay. And it states here:
"In light of the ongoing COVID-19



pandemic, we've taken steps to protect the health of our employees and communities," et cetera, et cetera.
And I guess there's a footer there -- let me ask you about that first -- the footer here says:
"...amazons-covid-19-blog-updates-on how-were-responding-to-the-crisis."
Do you see that? The very bottom.
A I do.
Q Okay. So does that sort of describe the purpose of the blog, is entries on how Amazon is responding to the COVID-19 crisis?
MS. BLAS: I'll just object. The document speaks for itself.
But you can answer.
BY MR. ACKERMANN:
Q Okay.
A I'm unsure.
Q Okay. And the we there -- how we were responding, I'm assuming that's Amazon, right?
A Yes.
Q Okay. Now, turning your attention to the March 6th entry at top of this page, in bold it



says:
"Amazon employees recommended to work from home."
Do you see that?
A I do.
Q Do you know who within recommended -- who within Amazon recommended that?
MS. BLAS: Objection. Vague.
THE WITNESS: It was a decision driven by senior leaders at the company with multiple other stakeholders.
BY MR. ACKERMANN:
Q Okay. So where it says there:
"In light of ongoing international COVID-19 developments, we now recommend all employees who can work from home to do so," the "we" there is the senior leadership of Amazon; is that right?
A That is --
MS. BLAS: Objection. The document speaks for itself.
But you can answer.
THE WITNESS: That is correct.
BY MR. ACKERMANN:

Q Okay. So as of March the 6th of 2020, Amazon had recommended all of its employees to work from home unless their work required them to be in the office, correct?

MS. BLAS: Object to the extent it misstates testimony.

THE WITNESS: That is correct.

BY MR. ACKERMANN:

Q Okay. And I believe it says that there in the second sentence of the March 6th entry:

"Employees and partners whose work requires being in their workplace have access to all of their usual paid and unpaid time-off benefits,"

et cetera -- okay.

Now, let's scroll up to April the 1st. The entry on April the 1st. Okay. There we go -- no, not that -- yeah.

The second entry on April the 1st, do you see it says "Work-from-home guidance" on that date?

A I do.

Q Okay. And do you know what the word "guidance" means in this context?

MS. BLAS: Object to the extent it calls for speculation.



But she can answer.

THE WITNESS: Guidance is, as I previously stated, more overarching guardrails that we were setting as a company, understanding that there were varying degrees by team, by region, by location, by country.

BY MR. ACKERMANN:

Q Okay. So this entry states:

"On April 1, we recommended that corporate office employees who work in a role that can be done from home should do so through April 24th. We updated that information" -- "this recommendation on April 14, and here is the new guidance..."

Do you see that language?

A I do.

Q So from March the 6th of 2020 all the way through April the 24th, there was clear recommendation from Amazon senior leadership for corporate office employees to work from home, correct?

MS. BLAS: Object to the extent it misstates the document.

But she can answer.



THE WITNESS: Recommended for those who were effectively able to do so.

BY MR. ACKERMANN:

Q Correct.

So is that a yes, for those people?

MS. BLAS: Objection. Asked and answered.

THE WITNESS: Correct.

BY MR. ACKERMANN:

Q Okay. So it goes on to say that:

"As the situation continues to stabilize...Amazon will localize work from home guidance beyond April 24 to follow local government orders and dates."

Just scroll down and see if there's anything more on that.

"...which will vary by location. When local governments say it is okay to return to the office and after we implement any unique government-issued requirements, Amazon will provide teams with options to gradually return to their office or to continue working from home."

Do you see that language?



A I do.

Q Okay. So continuing through April 24th, I guess the idea was Amazon was advising workers, or recommending their corporate office workers to work from home, and indicating that there would be future guidance provided as to return to the office or continuing to work from home, correct?

MS. BLAS: Object to form and to the extent it misstates testimony.

But you can answer.

THE WITNESS: Correct.

MR. ACKERMANN: Okay. All right. Let's move forward to April the 30th. Scroll upward.

Q All right. Do you see on April the 30th there's an entry entitled "Updated work-from-home guidance"?

A I do.

Q And it states:

"We continue to prioritize the health of our employees and follow local government guidance. Amazon employees who work in a role that can be done effectively from home are welcome to do so until at least October 2."

would it be accurate to say that the corporate-advised work-from-home period was still in effect?
MS. BLAS: Object. It's vague, calls for speculation and misstates the document.
THE WITNESS: I don't believe there was a corporate-advised work-from-home policy, so no.
BY MR. ACKERMANN:
Q Okay. Well, this entry, is updating people about a possible return to the office that had not yet taken place, correct?
A Correct. So that would be removing the welcome to work from home.
Q Okay. So it says here:
"...we expect our return to the office to be gradual," meaning as of March the 30th of 2021 there had not been a return to the office, correct?
MS. BLAS: Objection. Misstates the document, assumes facts.
BY MR. ACKERMANN:
Q You can respond.
A Broadly speaking, no; however, teams had unique needs and some -- it just depended on the team, the location and the building.
Q So when you say "Broadly speaking, no,"



what do you mean, broadly speaking there had not been a return to the office?
A A full return to the office.
Q Okay. And then it goes on:
"In the U.S., as vaccines become broadly available in the next few months, we expect more people will start coming into the office through the summer, with most back in the office by early fall."
And then it talks about Europe.
And the next paragraph states:
"As a reminder, Amazon offices remain open and about 10% of our corporate population currently works from an office each day."
Do you see that language?
A I do.
Q Is that true and correct, that as of the day of this 30th, 2021 entry, that about 10 percent of Amazon's corporate office employees were working from the office?
MS. BLAS: Object. It's asked and answered, calls for speculation, lacks foundation.
You can answer.



THE WITNESS: Yes.
BY MR. ACKERMANN:
Q Okay. And it goes on to talk about in the office -- and this is right up your -- in your wheelhouse -- the safety protocols, temperature screenings and physical distancing guidelines.
Due to those guidelines, it would actually have been impossible for everyone to come back to the office as long as those physical distancing guidelines were in effect, correct?
MS. BLAS: Objection. Outside the scope, calls for speculation.
THE WITNESS: It depended on location based on regulatory requirements within each region --
BY MR. ACKERMANN:
Q Right.
A -- each county, each city, each state.
Q But there were certain office occupancy limits that were substantially less than what had existed prior to the pandemic in each of the offices, correct?
MS. BLAS: Objection --
THE WITNESS: Correct.
MS. BLAS: -- lacks foundation.



THE WITNESS: Oh.
Correct.
MR. ACKERMANN: All right. Let's move up to the entry on June the 10th of 2021.
Q Okay. Again, this is another "Amazon updates Return to Office guidance" entry, correct?
A Correct.
Q And do you know who wrote this particular entry?
A I do not.
Q Okay. It says:
"Like all companies and organizations around the world, we're managing every stage of this pandemic for the first time, learning and evolving as we go. We've been thinking about how to balance our desire to provide flexibility to work from home with our belief that we invent best for customers when we are together in the office. With that in mind, we've adjusted our guidance on our plans for returning to the office and added some (sic) more clarity."
Do you see that language?

A I do.
Q So as of June 10th of 2021, there still had not been an actual return, en masse, to the office of Amazon's corporate office employees, correct?
A Correct.
MS. BLAS: I'll object that it's vague and assumes facts.
THE WITNESS: Correct.
MR. ACKERMANN: And then let's just scroll down. Is the "Read more" a separate page or does it continue on the next page? Is there a way for us to click on that "Read more," Jaci or not? No. Okay.
That's all right. I don't think they implemented whatever it said there anyway. I think it was going to talk about flexible option of half and half, or something like that.
MS. BLAS: I think we produced that page to you, Craig --
MR. ACKERMANN: Oh, did you? Okay. So maybe we'll add that as a separate -- we can come back to that.
Let's go -- let's go ahead to August the 5th, of 2021.



MS. BLAS: And, Craig, would you mind if we take a bio break when you're done with this document.
MR. ACKERMANN: Absolutely. We can take a break now if you want.
MS. BLAS: Okay.
MR. ACKERMANN: And then if we do, I can find that other document. Maybe that will be better.
MS. BLAS: Okay. That works.
MR. ACKERMANN: Okay. We'll take a break now. Take five minutes.
(Recess.)
MR. ACKERMANN: Back on the record.
Okay. So just to kind of keep the record clean, Ms. Hughes, I think what we're going to do is we're going to add another exhibit now. And I think we're up to --
Is this 14, Jaci? Is that right?
THE REPORTER: I show 14.
MS. BLACKWELL: Yes, 14. Sorry.
MR. ACKERMANN: We have up on the screen what will be marked as Exhibit 14.
(Exhibit 14 was marked for identification by the court reporter and is attached hereto.)



MR. ACKERMANN: Scroll down a little bit.
And I think this has the link to the expanded June 10th hot link on the Covid blog.
Can you make it a little bit bigger.
Okay. Yeah.
Q So -- and generically this talks about how Amazon was considering providing like the flex option to work from home a few days a week and in the office several other days.
That was in consideration on or around June of 2020, correct?
A Correct.
MR. ACKERMANN: And then scroll down, Jaci.
Q And the baseline was anticipated to be three days a week in the office and at home two days a week.
But was never implemented, at least not to date; is that right?
A I -- I'm unsure. Each team kind of had their own decision-making when this happened. So it's possible some teams did implement it and then possible that some teams didn't.
MR. ACKERMANN: Can you scroll down, Jaci.
MS. BLACKWELL: Sorry. More?



MR. ACKERMANN: No.
Q Just that last paragraph there:
"Our thinking is predicated on what we believe will be most beneficial for customers, while also trying to give employees more flexibility in their work environment and lives. For employees who were mostly remote pre-COVID, such as some Sales and Customer Service roles, they will remain working remote. For employees in roles which require onsite work, such as hardware engineers and frontline operations, these individuals will continue to work onsite. For roles where there are periods that being remote would be most effective (for example (sic) SDEs mostly coding where they don't need to)" -- "(where they don't need to)" -- I don't know what -- "...where it will yield the best results for customers."
Anyway, different options were being described there. I think some of it might be

employees that although it had previously anticipated employees would be coming in regularly in the office as of September the 7th, 2021, that wasn't going to happen until, at the earliest, January 3rd of 2022; is that correct?
A Again, it was team-dependent and depended on the unique needs of individual teams. But largely the return to office in bulk or in large cadence, no.
Q Okay. That return to the office was being extended until at least January 3rd, 2022, correct?
A Correct.
Q Okay. All right. To your knowledge, have there been any more recent blog updates, let's say, in 2022?
A On this blog?
Q Yeah.
A I'm sure there's been more blog updates as it relates to RTO.
Q Okay. Yeah, is RTO return to the office?
A Yeah, I'm not sure.
MR. ACKERMANN: Let's scroll up. Let's take a look at October the 11th. There we go.
Q Okay. Do you see -- oh, there's actually -- yeah, October the 11th.



Do you see the entry "Amazon offering teams more flexibility as we return to office"?
A I do.
Q And was that -- on or around October the 11th, is that when the new CEO of Amazon, Andy Jassy, shared a message with Amazon's employees updating the company's return to work policy?
A It is.
MR. ACKERMANN: And Jaci, can we put on the screen Exhibit -- what are we up to, 15?
THE REPORTER: 14.
MR. ACKERMANN: 14.
MS. BLACKWELL: I think it's 15. Sorry to interrupt.
THE REPORTER: Thank you. My mistake.
MS. BLACKWELL: This is Exhibit 15.
MS. BLAS: I think we're on 15.
(Exhibit 15 was marked for identification by the court reporter and is attached hereto.)
BY MR. ACKERMANN:
Q So, Ms. Hughes, we put on the screen share a document with the Bates numbers on the bottom AMZN -634 through -636 --
And scroll down a little bit, Jaci.
-- can you identify this, beginning on the



bottom of -634, as the message from CEO Andy Jassy published on October 11, 2021 about returning to the office?
A It is.
Q Okay. And moving to second page there, AMZN -635, do you see Mr. Jassy writes:
"As we start to think about the future, we've all been asking questions like, 'When are we really going back to the office, what will that really be like, how will I allocate my time between the office and home, how will others do it,'"
et cetera.
Do you see that language?
A I do.
Q So even as of the date of October 11th, 2021, the significant return to the office, the RTO, had not taken place, correct?
MS. BLAS: Objection. Vague.
THE WITNESS: It, again, was very team-dependent. Certain teams were coming back to the office, other teams were not. It was definitely depending on the location and the teams that were operating within those regions or buildings.



BY MR. ACKERMANN:
Q Okay. Well, do you see two paragraphs down it says:
"For corporate roles, instead of specifying that people work a baseline of three days a week in the office, we're going to leave this decision up to individual teams. And this decision will be made at the Director level."
Is that what actually happened?
A Yes.
MR. ACKERMANN: Okay. Let's scroll down a little bit more.
Q In the second paragraph from the bottom there, do you see the language:
"We're anticipating...you'll hear from your leaders about...specific plans before January 3, which is the date we previously set for people to start returning to the office at least three days a week"? Do you see that?
A I do.
Q Is that true, that January 3rd of 2022 was

the date that Amazon had previously set for employees to start returning to the office at least three days a week?
MS. BLAS: I'll just object to the extent it's asked and answered.
You can answer.
THE WITNESS: It was, but, again, it was varied by team and location.
BY MR. ACKERMANN:
Q Okay. And what happened in January of 2022, did -- did Amazon's corporate office employees return three days a week or not?
MS. BLAS: I'll object to the extent it calls for speculation.
You can answer.
BY MR. ACKERMANN:
Q If you know.
A In January, if you can remember, was the peak of Omicron --
Q Yes.
A -- so it slightly shifted a lot of teams' possible plans on who's coming back and when. But each team had varying degrees of who comes in, when they come in, what cadence, if they wanted them to come in at all. So it was really dependent on the



business and the business needs.
MR. ACKERMANN: Okay. Let's go back to the blog, please, Jaci.
Let's just scroll up to see any more recent dates from October the 11th. Are there any other entries about returning to the office. I don't see any so -- and just on the first page at the top there, Jaci.
Q I believe it says that this is last updated March the 4th of 2022.
Ms. Hughes, are you aware of any updates since March the 4th of 2022 to Amazon's Covid-19 blog?
A I am not. I haven't looked at it recently.
Q Okay. And what about a document called "Working in the Office," are you a -- are you familiar with Amazon having issued a document about RTO in August of 2022?
A I don't recall.
MR. ACKERMANN: Okay. Jaci, can we screen share this next exhibit, 16.
(Exhibit 16 was marked for identification by the court reporter and is attached hereto.)
BY MR. ACKERMANN:



Q Okay. We're putting up on the screen, as Exhibit 16, a document Bates-numbered AMZN -623 through -633.
Have you ever seen this document before?
A Not this document, but I have seen the wiki.
Q Okay. And at the top left it says:
"RTO - Working in the Office."
Is that -- is "RTO" a return to the office?
A Yes.
Q So in -- and there's a date on the bottom right here, August the 1st of 2022.
Do you see that?
A I do.
Q Okay. And I don't know, is that the date that this was printed or the date that this was implemented?
A I assume printed.
Q Okay. Do you know when this document first appeared on the wiki?
A It evolved over time, but it -- the first wiki was back in, God, 2020. And it evolved over time.
Q This particular version, do you know when



this version appeared in the wiki?
A This must have been in 2021, but please don't quote me on that. Well --
Q Okay. Well, I want to quote you, that's why I need specifics.
A I believe 2021.
Q Okay. And do you know which part of the year it was, which part -- like was it the winter or -- no.
A I don't recall.
Q All right. Because it says -- it says at the top, on the "Table of Contents" there:
"We are excited to welcome you into the office."
So I assume that means this is a document that people would have gotten -- either they're returning to the office or they were hired during the pandemic and had never been in the office, is that what this is for?
A Varying capacities this wiki was used. It was linked on that inside Amazon page that we've reviewed --
Q Okay.
A -- it was also provided to new hires as a resource to get more information.

Q Okay. All right. And do you know the current status in terms of the nine office locations that are -- that are listed on the deposition notice in California, do you know if Amazon's corporate office employees have returned to work in those offices full time as of today?
MS. BLAS: Objection. Vague and it calls for speculation.
THE WITNESS: I don't have daily counts on actual occupancy for those buildings.
BY MR. ACKERMANN:
Q Okay. And then if you look at AMZN -629, that particular page of this document, there's some questions under the header "Directors," and number 2 says:
"I am unsure about how my team may return, is there a deadline for when I need decide?
"No, timing may vary by team."
So is this sort of implementing what was in one of the prior blog entries we saw where it talked about how at the director and team level decisions would be made about returning to the office?
A Yes, it provided more flexibility for



teams, especially our global teams.
Q Okay. And then a few paragraphs down, do you see where it says "Badging in and out," what does that refer to?
A We have a Lenel badge system to get in and out of the corporate office buildings.
Q Okay. And so if somebody is working in an office, they have to have a badge, like a security check sort of thing to get in?
A That is correct.
Q Okay. And has that -- has that been the case all the way back to March of 2020 and even before?
A Yes, correct.
Q Okay. And does Amazon keep records as to the badge swipe data of who swiped in and was working in the office and who was not?
A Yes, we do.
MS. BLAS: Objection. Vague.
THE WITNESS: Oh.
MS. BLAS: Go ahead.
BY MR. ACKERMANN:
Q I'm sorry?
A Yes, we do.
Q Okay. And do you know how far back those



records are kept?
A I do not.
MS. BLAS: Object to the extent it calls for speculation, outside the scope of the notice.
MR. ACKERMANN: Okay, she says she doesn't know anyway.
Q All right. Was this document -- how was this disseminated to employees, how are they made aware of this document?
A As I mentioned, it was linked to the overall COVID-19 update page as a resource for employees to get to.
It was provided to new hires on their -- in their onboarding plans as a resource for office information.
It was also linked in several other locations throughout different team -- team wikis or team pages.
This was a general resource used.
MR. ACKERMANN: Okay. I think that's all I have for today, Lauren, so --
MS. BLAS: Okay, just give me a couple of minutes to review here and we can decide if we're going to go off the record.
MR. ACKERMANN: Okay. That works.



MS. BLAS: We can go off now and come back in a few minutes.
MR. ACKERMANN: Okay.
(Recess.)
MS. BLAS: We have nothing further for Ms. Hughes.
With respect to confidentiality, we will designate -- for now -- all portions of the transcript other than the testimony about the public-facing blog.
Craig, you and I can confer about the particulars there, but, just stating that for the record.
That's it.
THE REPORTER: Ms. Blas, I can't start pulling testimony out because I don't know exactly where that started or ended.
MS. BLAS: We'll let you know what we want to designate.
THE REPORTER: Okay. So should I designate the whole thing for now?
MS. BLAS: Sure, that works.
THE REPORTER: Okay. Thank you.

(TIME NOTED: 2:46 p.m. PST)

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 82

DAVID GEORGE WILLIAMS v. AMAZON.COM SERVICES LLC

KATIE HUGHES, 30(b)(6), JOB NO. 5332898

E R R A T A S H E E T

PAGE_____ LINE_____ CHANGE________________________

_________________________________________________

REASON___________________________________________

PAGE_____ LINE_____ CHANGE________________________

_________________________________________________

REASON___________________________________________

PAGE_____ LINE_____ CHANGE________________________

_________________________________________________

REASON___________________________________________

PAGE_____ LINE_____ CHANGE________________________

_________________________________________________

REASON___________________________________________

PAGE_____ LINE_____ CHANGE________________________

_________________________________________________

REASON___________________________________________

PAGE_____ LINE_____ CHANGE________________________

_________________________________________________

REASON___________________________________________

_______________________________ _______________

WITNESS Date

Page 83