GIBSON, DUNN & CRUTCHER LLP
TIMOTHY W. LOOSE, SBN 241037
  TLoose@gibsondunn.com
LAUREN M. BLAS, SBN 296823
  LBlas@gibsondunn.com
ARIANA H. SAÑUDO, SBN 324361
  ASanudo@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Tel.: 213.229.7000

GIBSON, DUNN & CRUTCHER LLP
KORY HINES, admitted *pro hac vice*
  KHines@gibsondunn.com
200 Park Avenue
New York, NY 10166
Tel.: 212.351.4000

*Attorneys for Defendant*
AMAZON.COM SERVICES LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DAVID GEORGE WILLIAMS, an individual, on behalf of the State of California, as a private attorney general, and on behalf of all Aggrieved Employees,<br><br>        Plaintiff,<br><br>   v.<br><br>AMAZON.COM SERVICES LLC, a Delaware Limited Liability Company; DOES 1 to 50, inclusive,<br><br>        Defendants. | **Case No.: 3:22-CV-1892-VC**<br><br>**DEFENDANT AMAZON.COM SERVICES LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**<br><br>Hearing Date: February 9, 2023<br>Hearing Time: 9:30 a.m.<br>Hearing Place: Courtroom 4<br>Judge: Hon. Vince Chhabria |

# TABLE OF CONTENTS

I.    Introduction ................................................................................................................1

II.   Factual Background ....................................................................................................3

    A.    Amazon Adapted To The Unprecedented Covid-19 Pandemic By Permitting
        Remote Work, Keeping Its Offices Open, And Prioritizing Employee Needs ..............3

    B.    Amazon's Expense Reimbursement Guidance Sought To Account For
        Individual Circumstances And Maintain Flexibility In A Changing Covid
        Landscape ............................................................................................................5

    C.    Employees' Remote Work Experience And Expense Reimbursement Practices
        Varied Significantly During The Class Period ...........................................................6

    D.    Plaintiff's Experience During The Pandemic Reflects Idiosyncratic Choices .............8

III.  Legal Standard ..........................................................................................................9

IV.   Argument ..................................................................................................................9

    A.    The Elements Of Section 2802 Present Individualized Questions That Cannot
        Be Resolved With Classwide Evidence And Predominate Over Common
        Questions...........................................................................................................10

    B.    Plaintiff's Proposed "Common Questions" Are Not Actually Common....................15

        1.    Amazon Does Not Have An "Illegal" Common Policy Of Not
            Reimbursing Employees For Monthly Internet Expenses—It Provides
            Reimbursements...........................................................................................15

        2.    Whether Amazon Had "Knowledge" That Employees Were Paying For
            Internet To Work Remotely Does Not Present A Common Question Apt
            To Drive The Resolution Of The Litigation. ........................................................18

    C.    The Individualized Liability Issues Cannot Be Managed............................................20

    D.    Plaintiff Is Neither A Typical Nor Adequate Class Representative ...........................24

V.    Conclusion ...............................................................................................................25

# TABLE OF AUTHORITIES

### CASES

*Aguilar v. Zep, Inc.*,
   No. 13-CV-563-WHO, 2014 WL 4245988 (N.D. Cal. Aug. 27, 2014) ...................................17

*Arroyo v. Int'l Paper Co.*,
   No. 17-CV-06211-BLF, 2019 WL 1508457 (N.D. Cal. Apr. 4, 2019) ...................................18

*Bernstein v. Virgin Am., Inc.*,
   227 F. Supp. 3d 1049 (N.D. Cal. 2017) ...................................14

*Bowen v. Target Corp.*,
   2021 WL 4860690 (C.D. Cal. June 24, 2021) ...................................11, 12, 21, 22

*Bowerman v. Field Asset Servs., Inc.*,
   39 F.4th 652 (9th Cir. 2022) ...................................9, 22, 23

*Cassady v. Morgan, Lewis & Bockius LLP*,
   145 Cal. App. 4th 220 (2006) ...................................10

*Cochran v. Schwan's Home Serv., Inc.*,
   228 Cal. App. 4th 1137 (2014) ...................................11, 13, 17

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2003) ...................................9, 23

*Cotter v. Lyft, Inc.*,
   60 F. Supp. 3d 1059 ...................................14

*Daubert v. Merrell Dow Pharms.*,
   43 F.3d 1311 (9th Cir. 1995) ...................................21

*Daubert v. Merrell Down Pharms., Inc.*,
   509 U.S. 579 (1993) ...................................21

*Dugan v. Ashley Furniture Indus., Inc.*,
   2016 WL 9173459 (C.D. Cal. Nov. 29, 2016) ...................................11, 12

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011) ...................................25

*Estrada v. Royalty Carpet Mills, Inc.*,
   76 Cal. App. 5th 685 (2022) ...................................24

*Gattuso v. Harte-Hanks Shoppers, Inc.*,
   42 Cal. 4th 554 (2007) ...................................10, 13

*Goldthorpe v. Cathay Pac. Airways Ltd.*,
  279 F. Supp. 3d 1001 (N.D. Cal. 2018) ................................................................14

*Gonzalez v. OfficeMax N. Am.*,
  2012 WL 5473764 (C.D. Cal. Nov. 5, 2012) ........................................................18

*Hamilton v. Wal-Mart Stores, Inc.*,
  39 F.4th 575 (9th Cir. 2022) ..................................................................................24

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ................................................................................25

*Harris v. Vector Mktg. Corp.*,
  753 F. Supp. 2d 996 (N.D. Cal. 2010) ...................................................................23

*Hopkins v. Stryker Sales Corp.*,
  No. 11-CV-2786-LHK, 2012 WL 1715091 (N.D. Cal. May 14, 2012) ................18

*Jensen v. Natrol, LLC*,
  No. 17-CV-3193-VC, 2020 WL 416420 (N.D. Cal. Jan. 27, 2020) ......................13

*Morgan v. Wet Seal, Inc.*,
  210 Cal. App. 4th 1341 (2012) ...............................................................................18

*Nash v. Horizon Freight Sys.*,
  No. 19-CV-1883-VC, 2020 WL 7640878 (N.D. Cal. Dec. 23, 2020) ...................11

*Nelson v. Dollar Tree Stores, Inc.*,
  2011 WL 3568498 (E.D. Cal. Aug. 15, 2011) .......................................................19

*Novak v. Boeing Co.*,
  2011 WL 9160940 (C.D. Cal. July 20, 2011) ...........................................10, 12, 17, 22

*O'Connor v. Uber Techs., Inc.*,
  58 F. Supp. 3d 989 (N.D. Cal. 2014) ..............................................................10, 14

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) (en banc) .......................................................9, 13, 22

*Pyara v. Sysco Corp.*,
  2017 WL 928715 (E.D. Cal. Mar. 9, 2017) .......................................................11, 12

*Richie v. Blue Shield of Cal.*,
  No. 13-CV-2693-EMC, 2014 WL 6982943 (N.D. Cal. Dec. 9, 2014) ..................11

*Sarviss v. Gen. Dynamics Info. Tech.*,
  663 F. Supp. 2d 883 (C.D. Cal. 2009) ...................................................................15

*Schulz v. QualxServ*, LLC,
    2012 WL 1439066 (S.D. Cal. Apr. 26, 2012) .......................................................................18

*Sims v. QC Printing II, LLC*,
    2022 WL 1592599 (C.D. Cal. Mar. 4, 2022) ...................................................................11, 12

*Stuart v. RadioShack Corp.*,
    641 F. Supp. 2d 901 (N.D. Cal. 2009) ...............................................................................18

*Sullivan v. Oracle Corp.*,
    51 Cal. 4th 1191 (2011) .......................................................................................................14

*Swamy v. Title Source*,
    No. 17-1175-WHA, 2018 WL 1586139 (N.D. Cal. Apr. 2, 2018) ........................................12

*Tehrani v. Macy's W. Stores, Inc.*,
    2016 WL 1559085 (C.D. Cal. Apr. 18, 2016) ...............................................................17, 24

*Tidewater Marine W., Inc. v. Bradshaw*,
    14 Cal. 4th 557 (1996) .........................................................................................................14

*TransUnion LLC v. Ramirez*,
    141 S.Ct. 2190 (2021) ..........................................................................................................13

*Vaquero v. Ashley Furniture Indus.*,
    824 F.3d 1150 (9th Cir. 2016) .............................................................................................24

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ..........................................................................................9, 15, 23, 24, 25

*Ward v. United Airlines, Inc.*,
    9 Cal. 5th 732 (2020) .....................................................................................................14, 15

*Wesson v. Staples the Office Superstore, LLC*,
    68 Cal. App. 5th 746 (2021) ................................................................................................24

*Williams v. J.B. Hunt Transp., Inc.*,
    2021 WL 5816287 (C.D. Cal. Dec. 7, 2021) .......................................................................10

*Wilson v. Kiewit Pac. Co.*,
    No. 09-CV-3630-SI, 2010 WL 5059522 (N.D. Cal. Dec. 6, 2010) ............................18, 20, 25

*Wilson v. Skywest Airlines, Inc.*,
    No. 19-CV-1491-VC, 2022 WL 1601410 (N.D. Cal. Jan. 31, 2022) ....................................22

**STATUTES**

Cal. Lab. Code § 2802(a) ..............................................................................................................9

v

**RULES**

Fed. R. Civ. P. 23(b) ....................................................................................................................9, 20

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

In Plaintiff's telling, Amazon ordered its corporate employees in California to work remotely in March 2020 at the start of the COVID-19 pandemic, where they remained, incurring internet expenses without reimbursement, until at least July 2022. To the extent some went into the office or managed to get reimbursed for those internet expenses, Plaintiff contends those individuals can be easily separated from the class. But nothing about this narrative holds water, and certainly not for the putative class of roughly 7,000 employees. For example:

− Amazon's corporate offices were open for virtually the entire class period, and badge swipe data confirms that employees could and routinely did access them as the pandemic wore on. Declaration of Michael P. Ward, Ph.D. ("Ward") at 4.

− Some employees had roles that required them to go into the office daily; others could effectively work remotely; and others were somewhere in between. Declaration of Lauren Blas, Ex. P (FRE 1006 Summary) at 1–6.[1]

− Some received direction from their team leaders to remain at home at certain times, or felt that it was their moral duty to stay home and follow "guidelines from CDC." *Id.* at 1–2.

− Many found working remotely beneficial and continued to do so through the present, even though remote work was not necessary or required by Amazon. *Id.* at 6–8.

− Some worked in California for the entire class period; others took the opportunity to relocate outside the state. *Id.* at 10–11.

− Some worked in their homes where they paid for monthly internet; others worked from places where internet was provided or paid by someone else. *Id.* at 5–7; Ex. O (ERC_Amazon_Data_20220912.xls) at cells X57, X68, X74, X108, X139, X144.

− Many employees received reimbursement for monthly internet expenses. *See* Ward at 9.

Each of these circumstances matters because California's reimbursement statute, Labor Code section 2802, covers only "necessary" expenses that are "reasonable." Amazon did not

---

[1]  All Exhibits are attached to the Blas Declaration unless otherwise noted. Exhibit P summarizes variation among putative class member testimony as to relevant issues under Federal Rule of Evidence 1006.

mandate anyone to stay home and use their internet, though in practice, many did. And there's the rub: Determining whether anyone actually incurred a "necessary" expense, and not merely the cost of an optional convenience, is a factual question turning on a host of highly individualized choices and circumstances, like the examples above. The record evidence—including declarations from 21 putative class members; deposition testimony from Plaintiff, Amazon's two Rule 30(b)(6) witnesses, and nine putative class members; and expert analysis—shows that necessity is not something a survey, badge swipe data, Amazon documents, or any other classwide records proposed by Plaintiff can answer. (And Plaintiff knows this, having attempted to address necessity in only one footnote in his entire motion.) As a result of that and other failings, Plaintiff has fallen short of meeting the "rigorous" requirements of Rule 23, including Rule 23(b)(3)'s requirement that any common questions affecting the putative class predominate over individualized ones.

Without a way to prove necessity and reasonableness on a classwide basis, it matters little whether Amazon's reimbursement guidance complied with California law (it did), nor whether Amazon categorically had knowledge employees were incurring monthly internet expenses (it did not). Amazon provided guidance in March and April 2020 that employees *were* allowed to claim reimbursement for internet or extra mobile phone costs incurred as a result of working from home and encouraged employees to discuss such reimbursement with their managers. Thousands availed themselves of this process, including hundreds who received reimbursement specifically for internet expenses. To the extent others did not, their experiences do not establish a common illegal "policy" as Plaintiff claims. While some might have a claim under section 2802 despite Amazon's reimbursement process, determining who and why would be unmanageable, as there is no classwide proof speaking to these employees' choices. The same is true of Amazon's knowledge—even assuming some employees' roles allowed them to work remotely and likely

involved the use of internet, Plaintiff offers no evidence to show how Amazon would have known *all* employees were using internet to work, principally in California, or that they themselves were incurring monthly expenses as a result. These issues are particularly salient here given the unprecedented upheaval of the pandemic and scattering of workforces once commuting was no longer a regular part of daily life. As a result, neither the legality of Amazon's reimbursement "policy" nor Amazon's knowledge raises a common issue apt to drive the resolution of the case.

Further, there is no "typical" remote work experience that would support a classwide resolution of the section 2802 claim. Even if there were, Plaintiff's own experience would not be representative of others. Plaintiff did not submit a single reimbursement request; chose not to go into the office or request an access badge even though others did; relocated outside California for part of his employment; and incurred additional internet costs due to his own particular remote work preferences, not because of anything Amazon required or expected.

In short, Plaintiff simply cannot transform his unique experience during the pandemic into a sweeping class action. This Court should deny Plaintiff's motion for class certification.

## II.    FACTUAL BACKGROUND

### A.    Amazon Adapted To The Unprecedented COVID-19 Pandemic By Permitting Remote Work, Keeping Its Offices Open, And Prioritizing Employee Needs

When COVID-19 first appeared, few understood the degree to which the virus would upend their working and personal lives. During those uncertain times, Amazon's top priority was providing a safe environment for its employees. Ex. A (AMZN00000333) at 5. Given the size and breadth of its operations, Amazon prioritized providing maximal flexibility to accommodate its employees' unique individual circumstances. Ex. B (Hughes) at 50:3-15; Ex. J (AMZN00000634) at 2. Thus, in March 2020, Amazon recommended that employees who could work remotely do so, while emphasizing that corporate offices would remain open and available.

Ex. A at 106 (Mar. 6, 2020 entry); Ex. B at 30:2-7.  Plaintiff's repeated and misguided invocation of a supposed "corporate-advised work-from-home period," Mot. at 3–8, is therefore misguided, as Amazon's 30(b)(6) witness, Katie Hughes, repeatedly clarified that there was no such *blanket* policy at Amazon.  Ex. B at 24:6-17; 24:19-25:7; 53:25-54:6.

As it became clear COVID-19 was not going away quickly, Amazon "welcome[d]" employees to continue to work remotely if they "work[ed] in a role that [could] effectively be done from home" and preferred to do so.  Ex. A at 58.  Consistent with its longstanding commitment to respecting each employee's unique needs and circumstances during the pandemic, Amazon did not restrict where an employee chose to work remotely—whether at a family member's home, vacation rental, library, coffee shop, or anywhere else.  *See* Ex. B at 40:11-41:9.  Amazon also emphasized that decisions about remote work would be left to the discretion of individual team directors, who were empowered to set guidelines and expectations regarding remote work.  *Id.* at 31:24-32:3; 69:2-12.  Specifically, these directors were tasked with determining, in conjunction with their direct report(s), whether remote work was appropriate, taking into consideration roles, job duties, health, personal circumstances, family members, and comfort level during the pandemic.  *Id.* at 69:2-12.  As a result, there was variation both across and within teams with respect to who went into the office and when and how often they did so.  *Id.* at 69:2-70:8.

As employees became accustomed to remote work, some managers sought to maximize flexibility and "keep it []everyone's choice" about where to work.  Ex. P at 1.  Other managers prioritized creating safe office conditions for employees to "meet in person to help ideate and solve []problems," or set hybrid schedules whereby teams worked remotely at varying intervals and came together for in-person meetings.  *Id.* at 1.  As the pandemic progressed, Amazon continued to leave remote work decisions "up to individual teams."  Ex. J at 2; Ex. B at 63:23-66:9.

Throughout, Amazon's offices in California (and elsewhere) remained open and Amazon continued to operate those offices at the same if not greater expense.  Ex. B at 17:7-24; *see also* Ex. A at 5.

Employees hired before the pandemic typically were issued a badge to access their assigned office location.  Ex. B at 75:2-14.  Employees who started during the pandemic were generally assigned to an office location, onboarded remotely, and advised they could request a badge to access that location (Ex. C (AMZN00000496) at 1–2), though certain putative class members starting in 2021 received badges immediately.  Ex. V (Schellenberg) at 20:13-21 (received badge with laptop).  Badge swipe data for the nine locations at issue in this lawsuit shows a wide variation in what employees did during the class period, but also indicates most employees could and did go into their assigned offices during the class period.  Ward at 7 & Table 2.  And almost half (46%) of the employees at the nine locations swiped into their office at least once a month.  Ward at 8.

## B.    Amazon's Expense Reimbursement Guidance Sought To Account For Individual Circumstances And Maintain Flexibility In A Changing COVID Landscape

Amazon has long maintained expense reimbursement guidance.  Ex. L (AMZN00000012). Amazon's philosophy with respect to reimbursement is to respect individual circumstances while also expecting that employees submit only reasonable expenses.  Ex. E (McCray) at 46:10-19. Employees could access these guidelines through Amazon's intranet and submit reimbursement requests using Amazon's "Concur" system.  *Id.* at 21:24-22:4; 91:20-24.

With the onset of the pandemic and, for some, a sudden switch to remote work, Amazon worked within its existing reimbursement framework to devise a process for employees to seek reimbursement for remote work expenses, including internet-related expenses.  *Id.* at 48:3-9; Ex. K (AMZN00000447) at 1.  Recognizing employees were differently situated and that COVID conditions were changing rapidly, Amazon left it to its employees to determine, in conjunction

with their managers, what to seek reimbursement for and in what amounts. Ex. E at 48:17-21.[2]

Consistent with its decentralized approach, Amazon did not seek to harmonize the guidance from its global reimbursement team with individual team guidance. *Id.* at 101:17-25 (contrary to Plaintiff's characterizations, Amazon's expense reimbursement team "did not draft or review []content" individual team guidance "before publication"); *compare, e.g.*, Exs. F-I (sample individual team policies). Plaintiff never submitted a reimbursement request, claiming his manager told him no reimbursement for monthly internet was available. Ex. D (Plaintiff) at 198:3-201:14. Even if true, that was not a uniform experience: Over 2,000 putative class members received reimbursements during the class period for remote-work expenses, including 619 employees who received internet-related reimbursements. *See* Ward at 9. And many did seek reimbursement for preexisting home internet, not just upgrades or new services. Ex. P at 15-17.

## C.    Employees' Remote Work Experience And Expense Reimbursement Practices Varied Significantly During The Class Period

Due to constantly changing pandemic conditions, employees' work habits evolved and differed depending on their roles and individual circumstances. The putative class includes a wide variety of job duties and titles, ranging from creative directors to lab engineers, infrastructure services directors, and hardware technologists. *Id.* at 4–5 (listing various job titles). Some jobs require access to onsite equipment, while others more readily adapted to remote work, and evidence reflects variety in office attendance accordingly. *Id.*; Ward at 4, 8–9.

Employees' work habits were also influenced by individual preference. While swipe data shows the majority of the putative class went into their assigned Amazon office at least once (Ward at 4 (74.1% of Amazon employees swiped into one of nine corporate sites at some point during

---

[2]   Plaintiff's description of why Amazon elected not to use a stipend model mischaracterizes the testimony of Amazon's 30(b)(6) witness, Jessica McCray. See Ex. E at 95:11-97:10.

the class period, and some regularly)), employees chose to work from home or in the office for widely varying reasons and frequencies, including distance from office and individual preference. Ward at 4, 10. Some employees "prefer[red] working with people face-to-face" and went into the office more often, while others had a "strong preference for remote" work because they "hate[d] commuting," enjoyed the "freedom" for "personal stuff" or "family stuff" associated with working from home, or wanted to follow CDC guidelines. Ex. P at 1–3, 7–10. Some employees worked from places other than their homes for periods of time; some worked from three to four different states or even other countries during the class period. *Id.* at 12-13 (with one employee spending 40% of his time outside of his home city in 2021). Employees' choices regarding remote work also changed as pandemic conditions evolved. *See, e.g.*, *id.* at 1–3. Some decided they wanted to upgrade their home equipment and "get [a] proper set up" for remote work as the pandemic wore on, while others did not. *Id.* at 16.

Whether an employee actually incurred expenses relating to remote work varied, too. For example, Plaintiff's survey responses indicate that some did not incur internet expenses because they were included in their homeowner's association fees, or because their parents or landlord paid for the internet. Ex. O at cells X57, X68, X74, X108, X139, X144. Some worked from somewhere other than their home, such as coffee shops, Airbnbs, their parents' homes, or other places with free or included internet. Ex. P at 14. Others incurred internet expenses, but sought and received reimbursement for them. *Id.* at 17–19. To the extent any did not, unless they raised the issue, Amazon had no way of knowing the reason. Ex. E at 36:2337:12. After all, some people chose not to submit reimbursement requests even though they knew they could have, including some who didn't feel that they should do so "given that it's being used by the whole home for personal usage" and some "for no particular reason." Ex. P at 15, 17. And of course, the degree to which

a putative class member used their internet for work necessarily varied (*id.* (estimating 80% of internet use was for personal reasons, or anywhere from 12 to 20 hours or more per week)), as did the degree to which they shared internet with other household members (*id.* (sharing internet with live-in partner or multiple roommates who work from home full time).

### D.    Plaintiff's Experience During The Pandemic Reflects Idiosyncratic Choices

Plaintiff began working at Amazon in March 2020 as a software engineer, and his own experience during the pandemic reflects the individual and differing experiences of putative class members.  For example, he left the state for periods of time to work remotely elsewhere and he customized his work-from-home setup to suit his idiosyncratic needs (as did others).  Ex. D at 58:21-59:7; 47:10-50:7.  Plaintiff also lived with one other person, and despite having three bedrooms he admittedly could have used for work, he rejected them as "not the most convenient option" and chose to purchase another internet connection to work somewhere his preexisting internet did not reach.  *Id.* at 46:22-47:16, 48:16-50:7, 151:21-152:21.

As another example, at the beginning of his employment with Amazon, Plaintiff was assigned to a physical office location in Santa Cruz.  *Id.* at 31:5-7; 131:17-19.  Unlike thousands who went into Amazon's California offices at varying frequencies, including some who started at Amazon after March 2020 (Ward at 9–10), Plaintiff never asked for a badge to access the building, claimed he could not go into the office, and assumed no one on his immediate five-person team, or any of the "maybe 25, maybe 30" coworkers with whom he interacted while at Amazon, did either.  Ex. D at 74:16-75:6; 80:2-6; 81:15-82:5; 130:16-131:7; 203:9-15.  But the badge swipe data showed otherwise:  At least two other software engineers at Plaintiff's office location who began work in March 2020 obtained a badge and accessed the office repeatedly during the class period.  Ward at 11–12.  Plaintiff also did not submit a single reimbursement request, claiming his manager told him that he could not.  Ex. D at 67:3-17; 198:3-7; 226:14-23.  But the data shows

hundreds of employees sought and received reimbursement for internet expenses.  Ward at 9–10.

## III.   LEGAL STANDARD

It is Plaintiff's burden to prove not only "'sufficiently numerous parties, common questions of law or fact,' typicality of claims or defenses, and adequacy of representation, as required by Rule 23(a)," but in addition, at least one of the provisions of the "even more demanding" Rule 23(b).  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2003) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011)).  Rule 23(b)(3) further requires proof that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  *Id.* at 33.  Predominance also includes an assessment of whether common questions predominate over any "individualized questions about injury or entitlement to damages."  *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022) (en banc).  And Plaintiff must demonstrate damages are "capable of measurement on a classwide basis" and "traceable to the same injurious course of conduct underlying the plaintiffs' legal theory."  *Bowerman v. Field Asset Servs., Inc.*, 39 F.4th 652, 663 (9th Cir. 2022).

## IV.   ARGUMENT

Plaintiff seeks to represent a class and PAGA group bringing claims under Labor Code section 2802, which requires an employer to "indemnify his or her employee for all necessary expenditures . . . incurred by the employee in direct consequence of the discharge of his or her duties."  Cal. Lab. Code § 2802(a).  "[N]ecessary expenditures" are limited to "all reasonable costs."  *Id.* § 2802(c).  Further, section 2802 does not have extraterritorial application.  *See O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1006 (N.D. Cal. 2014).  The primary elements of a section 2802 claim are: "(1) the employee made expenditures or incurred losses; (2) the

expenditures or losses were incurred in direct consequence of the employee's discharge of his or her duties, or obedience to the directions of the employer; and, (3) the expenditures or losses were necessary." *Cassady v. Morgan, Lewis & Bockius LLP*, 145 Cal. App. 4th 220, 230 (2006).

    **A.**    **The Elements Of Section 2802 Present Individualized Questions That Cannot Be Resolved With Classwide Evidence And Predominate Over Common Questions**

    Assessing the extent to which an employee can assert a claim under section 2802, and specifically, whether they have established it was (1) necessary to (2) incur an expense as a direct consequence of their job duties, (3) for work performed principally in California, requires consideration of multiple individual issues as to Amazon's liability, as well as an assessment of damages, which are not amenable to classwide resolution.

    ***Whether Expenses Were Necessary.***    Analyzing this element requires the Court "to determine why each [employee] who elected to use [home internet] for work-related purposes chose to do so, and whether such a choice was reasonable under the circumstances." *Williams v. J.B. Hunt Transp., Inc.*, 2021 WL 5816287, at *8 (C.D. Cal. Dec. 7, 2021) (citing *Gattuso v. Harte-Hanks Shoppers, Inc.*, 42 Cal. 4th 554, 568 (2007)).  Some remote work expenses may be optional conveniences that are not "necessary." *Novak v. Boeing Co.*, 2011 WL 9160940, at *3 (C.D. Cal. July 20, 2011) (internet and phone expenses incurred in a voluntary remote-work program an optional convenience and not "necessary" expenditures).  Distinguishing between necessity and optional convenience is an inherently individualized exercise, as many courts have found in analogous cases.  Key considerations include the availability and accessibility of employer-provided devices, the degree to which personal devices were used or required to be used, and the employee's motivation for using a personal device on any given occasion. *See Williams*, 2021 WL 5816287, at *8; *Bowen v. Target Corp.*, 2021 WL 4860690, at *9 (C.D. Cal. June 24, 2021); *Dugan*

*v. Ashley Furniture Indus., Inc.*, 2016 WL 9173459, at *4 (C.D. Cal. Nov. 29, 2016);[3] *Pyara v. Sysco Corp.*, 2017 WL 928715, at *1 (E.D. Cal. Mar. 9, 2017); *Sims v. QC Printing II, LLC*, 2022 WL 1592599, at *14 (C.D. Cal. Mar. 4, 2022) (all declining to certify section 2802 claims because of the need for individualized inquiries as to personal cell phone expenses).

These considerations apply here as well.  Contrary to *Nash v. Horizon Freight Systems*, No. 19-CV-1883-VC, 2020 WL 7640878 (N.D. Cal. Dec. 23, 2020), on which Plaintiff relies, there was no uniform policy at Amazon *requiring* employees to work remotely, and multiple putative class members testified that remote work guidance was "location-specific" or director-specific. Ex. P at 1–2.  Rather, Amazon briefly recommended that employees could work remotely from March 11 to April 30, 2020 (Ex. A at 106), and after that date, employees who held a role "that [could] be done effectively from home" were "welcome" to.  Throughout, Amazon's offices remained available, as evidenced not only by public statements (*e.g.*, Ex. A at 58), but also by badge swipe data.[4] Ward at 7.  That data also shows office attendance fluctuated as the pandemic wore on, decreasing as variants peaked, but generally increasing during the class period.  *Id.*

Because remote work was not categorically required by Amazon, the analysis moves to whether using home internet for work was "necessary" under the circumstances and, if so, whether the expenses were "reasonable."  That, of course, turns on the "why's" of each employee's decision

---

[3] Plaintiff's reliance on *Richie v. Blue Shield of California*, No. 13-CV-2693-EMC, 2014 WL 6982943 (N.D. Cal. Dec. 9, 2014) and *Cochran v. Schwan's Home Service, Inc.*, 228 Cal. App. 4th 1137 (2014) to assert that necessity can be resolved on a classwide basis (Mot. at 20–23) is unavailing.  *Dugan* declined to follow those cases where, as here, plaintiff has not established the existence of a policy or classwide requirement for employees to use cell phones.  2016 WL 9173459, at *4 n.2.

[4] These nine office locations were open during the entire class period, including March and April of 2020.  *See* Ex. B at 17:21-24.  Employees who were not able to effectively work from home could, and did, work from Amazon's offices during the earliest stages of the pandemic, with appropriate precautions.  Ex. P at 10–11.

to work remotely and to use their home internet (if they did). As in *Williams*, Amazon employees varied in how they worked, with some required "to work onsite" and others able to work "effectively []both in the office and remotely." Ex. P at 1–5. Motivation for working remotely is an issue, too: Some relocated far from their office location during the pandemic, which made regular office attendance infeasible or impractical. *See Dugan*, 2016 WL 9173459, at *4 (individualized questions as to the need to incur personal expense and motivation for doing so); *Sims,* 2022 WL 1592599, at *14 (individualized questions as to feasibility of employer-provided alternatives); Ex. P at 12–13. Some stayed home in the name of protecting public health. Ex. P at 1–3. Others acknowledged they could work in the office, but simply preferred the convenience of working remotely. *Id*. at 6–8 (noting reasons including avoiding commute, being around pets, saving money, or prioritizing safety). Unlike the appraisers in *Swamy v. Title Source, Inc.*, No. 17-CV-1175-WHA, 2018 WL 1586139, at *3 (N.D. Cal. Apr. 2, 2018), for example, who were required to use their home internet for work and had no other employer-provided option, Amazon employees had alternatives, and thus, remote work expenses were not categorically "necessary" expenditures. *Novak*, 2011 WL 9160940, at *3; *Bowen*, 2021 WL 4860690, at *9; *Pyara*, 2017 WL 928715, at *1. Some even had routers or hotspots provided by Amazon. Ex. P at 14, 21. As such, there is no way to determine, on a classwide basis, whether monthly home internet expenses incurred while working remotely in California were "necessary," much less reasonable.[5]

***Whether Employees Incurred Monthly Home Internet Expenses.*** The extent to which an employee herself incurred an internet expense as a direct consequence of her job duties is also a

---

[5] There was also variation in whether *particular* internet expenses were necessary or reasonable: For example, Plaintiff's decision to set up his home office outside the reach of his existing internet was arguably a matter of personal preference (*i.e.*, so his pet rabbits could remain in one of the bedrooms), not a "necessity." Ex. D at 48:16-50:7. Indeed, none of the 157 survey respondents reported buying an *additional* internet plan like Plaintiff did.

fact-specific issue of injury that cannot be determined on a classwide basis. This is not a hypothetical concern, as Plaintiff's expert witness, Laura Steiner, conducted a survey showing that employees had their internet paid for by others; only worked in locations where internet was free of cost; or had the cost included in rent or homeowners' association fees. Ex. O at cells X57, X68, X74, X108, X139, X144; Ex. P at 14. An employee who never incurred an expense for monthly home internet cannot claim an injury from alleged non-reimbursement.[6] And a class "cannot be certified" where the proposed class definition encompasses uninjured individuals who cannot be readily identified. *E.g.*, *Jensen v. Natrol, LLC*, No. 17-CV-3193-VC, 2020 WL 416420, at *1 (N.D. Cal. Jan. 27, 2020); *Olean*, 31 F.4th at 668, 669 n.14 (predominance not satisfied where classwide injury not subject to common proof and proposed class "include[s] a great number of members" who "could not have been harmed").

**_Whether Employees Worked Principally in California._** The extent to which putative class members worked in California during the class period is yet another individualized issue precluding classwide treatment. In general, a worker may be considered a "wage earner of California" and "therefore subject to the state's wage orders," if they "resid[e] in California, receive pay in California, and work exclusively, or principally, in California." *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1059, 1062 (citing *Tidewater Marine W., Inc. v. Bradshaw*, 14 Cal. 4th 557, 578

---

[6] *Cochran*'s statement that employees "incur losses" under section 2802 regardless of "whether the phone bill is paid for by a third person, or at all" is not to the contrary. 228 Cal. App. 4th at 1144. In *Cochran*, cell phone use was *always* required by the employer for every employee. *Id.* at 1145. Here, whether an employee needed home internet as a practical matter differed by person and team. *Cochran* is also at odds with the plain language of section 2802, which requires an "incurred *loss*[]" (emphasis added), as well as the California Supreme Court's decision in *Gattuso*, which referred to reimbursement for "all expenses *actually* and necessarily incurred." 42 Cal. 4th at 575 (emphasis added). Finally, even if *Cochran* were correct that section 2802 permits uninjured persons to receive reimbursements for expenses they did not actually incur, Article III precludes the adjudication of such claims in federal court. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207–08 (2021); *Olean*, 31 F.4th at 668 n.12.

(1996)).  "Principally" means working "the majority" of their time in California.  *Ward v. United Airlines, Inc.*, 9 Cal. 5th 732, 760 (2020).  California applies a presumption against the extraterritorial application of state law (*see Sullivan v. Oracle Corp.* 51 Cal. 4th 1191, 1207 (2011)), and a court in this district has held that the California legislature did not intend section 2802 to apply extraterritorially (*see O'Connor*, 58 F. Supp. 3d at 1006), which might otherwise raise Dormant Commerce Clause concerns (*Cotter*, 60 F. Supp. 3d at 1064).

As this Court has stated, whether California law applies to an employee whose work is performed in part outside California "depends on all the facts and circumstances."  *Goldthorpe v. Cathay Pac. Airways Ltd.*, 279 F. Supp. 3d 1001, 1003 (N.D. Cal. 2018).  For example, if "temporary out-of-state travel is an inherent part of the job," and such travel can reasonably be expected based on the nature of the work (*e.g.*, flight attendants, pilots), California law might apply.  *Bernstein v. Virgin Am., Inc.*, 227 F. Supp. 3d 1049, 1060 (N.D. Cal. 2017).  That is not the case here.  While the job duties of the putative class members varied, generally speaking, out-of-state travel was not an "inherent part of their job," *see Goldthorpe,* 279 F. Supp. 3d at 1003, and no one has testified otherwise.  Yet many putative class members left the state for extended periods of time and some relocated permanently, Ex. P at 12–13, and Ms. Steiner's survey confirmed that multiple other respondents listing locations other than California as their home states may be in the same position.  Ex. O at K81–82, K91, K135, K159, L81–82, L91, L135, L159.  Plaintiff himself considered relocating outside of California not once, but twice, including by moving to the United Kingdom for several weeks without giving Amazon advance notice.  Ex. D at 58:3-59:17; 29:2-24; 30:2-7.  To the extent putative class members did not perform the majority of their work in California, they would not be able to assert a claim under section 2802.  *Cf. Ward*, 9 Cal. 5th at 760; *see also Sarviss v. Gen. Dynamics Info. Tech.*, 663 F. Supp. 2d 883,

900 (C.D. Cal. 2009) (key issue in evaluating whether California law applies "is whether an employee principally works in California").  Given the pandemic, during which employees relocated for extended periods of time even retaining an affiliation with their California office location, there is no way to parse who worked "principally" in California without individualized inquiries.

**B.    Plaintiff's Proposed "Common Questions" Are Not Actually Common**

Plaintiff offers two common questions he contends will drive the resolution of the case: whether Amazon had an "illegal" common policy of not reimbursing employees for monthly internet and whether Amazon "knew" its corporate employees in California were using their home internet for work.  Dkt. 40 (Mot.) at 1.  Neither will generate common answers "apt to drive the resolution" of the case.  *Dukes*, 564 U.S. at 350.  Even if they could, those answers would be outweighed by the additional individual inquiries necessary to satisfy the elements of section 2802.

**1.    Amazon Does Not Have An "Illegal" Common Policy Of Not Reimbursing Employees For Monthly Internet Expenses—It Provides Reimbursements**

Plaintiff first contends Amazon has an "illegal" policy of reimbursing only for "incremental" expenses, rather than "preexisting ones."  Mot. at 10.  To start, the supposed "illegal policy" comes into play only if Amazon had an obligation to reimburse class members under section 2802 in the first place.  As discussed, determining whether such an obligation even exists is a question that requires the sort of individual discussion reflected in the putative class member depositions and declarations.  *See* pp. 7–9, *supra*.  In any event, Plaintiff is wrong about the existence of a "policy," the intent behind it, and how it worked in practice.

Amazon's reimbursement guidance provided that employees were "allowed to []claim reimbursement" for "internet or extra mobile phone costs [incurred] as a result of working from home . . . if [a] manager has pre-approved."  Ex. K at 1.  Jessica McCray, Amazon's Rule 30(b)(6)

witness and principal program manager for global expense who drafted the guidance, explained that "employees [were] allowed to temporarily claim reimbursement of internet expenses." Amazon's intent was not to "discourage or encourage expense reimbursements" but to "provide" guidance on which expenses could be reimbursed and to direct employees to their managers if they had questions.  Ex. E at 73:22-25, 77:20-78:2; *see also* Ex. M (reflecting questions).

Amazon's guidance was modified in May 2020 to provide that "[e]mployees are allowed to temporarily claim reimbursement for incremental internet and extra mobile phone costs if manager has preapproved."  Ex. K at 1.  Plaintiff contends the word "incremental" shows that, whatever reimbursements class members may have sought and received, Amazon did not intend to reimburse employees for preexisting internet expenses.  Mot. at 8–9.  But the evidence contradicts that contention, too.  As Ms. McCray, the author of the guidance, explained, the term "incremental" was not meant to limit the expenses that could be reimbursed, but was added to clarify that COVID-related internet reimbursements would be allowed in addition to other previously authorized internet reimbursements, such as those provided to fully remote workers never assigned to an office location.  Ex. E at 44:11-48:21; Ex. N (Resps. & Objs. to Third Set of Interrogs.) at 6–7.  "[I]ncremental" was added to clarify that *those* individuals could seek reimbursement of "incremental" internet expenses incurred due to the pandemic (*e.g.*, to increase internet bandwidth), whereas employees who had not previously been eligible for monthly internet reimbursement were now eligible.  Ex. E at 48:3-9.[7]

---

[7] Plaintiff's own cited authority confirms that an employer need not reimburse for *all* of an employee's necessary internet expenses, but rather a "reasonable percentage" of such costs.  *See, e.g.*, *Cochran*, 228 Cal. App. 4th at 1144; *Aguilar v. Zep, Inc.*, No. 13-CV-563-WHO, 2014 WL 4245988, at *1 (N.D. Cal. Aug. 27, 2014) (reimbursement only for expenses in "direct consequence of the discharge of his or her duties").  Section 2802 does not impose liability for the entirety of necessary expenses simply because some percentage may be work-related.  *Tehrani v. Macy's W. Stores, Inc.*, 2016 WL 1559085, at *8 (C.D. Cal. Apr. 18, 2016).

As Ms. McCray also testified, in practice, Amazon did not scrutinize whether an internet expense was "incremental" or not.  Ex. E at 62:25-64:5.  Consistent with Ms. McCray's explanation, more than 600 putative class members submitted and received reimbursement for monthly internet.  *See* Ward at 9; Ex. P at 17–20.  Many sought and were reimbursed for the full amount of their regular monthly internet bills, while others chose to submit only a portion of their monthly internet bills for reimbursement.  *Id.*  There is no evidence anyone who sought reimbursement for monthly internet did not receive it; in many cases, those employees were reimbursed for more than the actual internet costs they incurred in direct consequence of their job duties, which is all section 2802 requires.[8]  *Cf. Tehrani,* 2016 WL 1559085, at *8 (citing *Cochran,* 228 Cal. App. 4th at 1140).  To the extent certain teams issued different guidance (*e.g.*, Ex. B at 69:2–70:8), or to the extent certain individual employees, like Plaintiff, claimed to have had a different understanding of what was permitted based on a conversation with their manager, those idiosyncratic experiences confirm that the supposed "policy" was anything but uniform and cannot support certification.  *Compare Gonzalez v. OfficeMax N. Am.*, 2012 WL 5473764, at *3–4 (C.D. Cal. Nov. 5, 2012) (denying certification because plaintiffs had not met burden of showing a uniform policy of non-reimbursement);[9] *Morgan v. Wet Seal, Inc.*, 210 Cal. App. 4th 1341, 1358 (2012) (denying certification where reimbursement practices varied and proving liability would

---

[8] To the extent Amazon reimbursed class members for *more* than an "incremental" amount, that does not imply Amazon had an *obligation* to do so.  *See, e.g.*, *Novak*, 2011 WL 9160940, at *3 (company's previous policy of reimbursing virtual workers' expenses" "irrelevant" to section 2802 analysis; company was "not now in violation of § 2802(a) simply because it has changed its reimbursement policy").  Employees agreed Amazon's reimbursements included amounts attributable to non-work use.  *See, e.g.*, Ex. P at 17.

[9] Plaintiff quotes *Schulz v. QualxServ, LLC* (Mot. at 21) to support his assertion that this dispute can be adjudicated on a classwide basis.  2012 WL 1439066 (S.D. Cal. Apr. 26, 2012).  *Schulz* was distinguished by *Gonzalez* on the grounds that the employer had a uniform reimbursement policy, and only the amount of one technician's expenses (*i.e.*, damages) was at issue.  *See Gonzalez*, 2012 WL 5473764, at *6 n.10.  The same distinctions hold here.

require individualized inquiries to address "what []the manager told the employee regarding reimbursement") *with Hopkins v. Stryker Sales Corp.*, No. 11-CV-2786-LHK, 2012 WL 1715091, at *4–5, *10 (N.D. Cal. May 14, 2012) (commonality satisfied where employer had uniform policy of using sales commissions to cover business expenses and class members also had common duties and expenses); *see also Wilson v. Kiewit Pac. Co.*, No. 09-CV-3630-SI, 2010 WL 5059522, at *5 (N.D. Cal. Dec. 6, 2010) ("evidence of one [employee] informed that the [employer] did not reimburse [an expense] is not sufficient to demonstrate a widespread practice that supports []certification"); *Arroyo v. Int'l Paper Co.*, 17-CV-6211-BLF, 2019 WL 1508457, at *4 (N.D. Cal. Apr. 4, 2019) (no commonality as to non-reimbursement of uniforms where uniform requirement varied based on job duties and other factors).

### 2. Whether Amazon Had "Knowledge" That Employees Were Paying For Internet To Work Remotely Does Not Present A Common Question Apt To Drive The Resolution Of The Litigation

Another element of section 2802 requires an employee to show that their employer knew or had reason to know that the employee has incurred a reimbursable expense. *Stuart v. RadioShack Corp.*, 641 F. Supp. 2d 901, 904 (N.D. Cal. 2009). As relevant here, Plaintiff must explain whether and how Amazon "acquired knowledge that []expenses were incurred by Plaintiff, or any other class members." *Nelson v. Dollar Tree Stores, Inc.*, 2011 WL 3568498, at *2 (E.D. Cal. Aug. 15, 2011). A key premise of Plaintiff's "knowledge" argument is that all corporate jobs at Amazon are capable of being performed remotely, relying on the assertion that all employees receive a "Midway PIN" and "USB security key" to log onto the Amazon network. Mot. at 6. But Plaintiff misunderstands several basic facts. First, *all* corporate employees at Amazon, *regardless* of their ability or desire to work remotely, are provided a security key and Midway PIN as part of their onboarding. Ex. B at 35:16-23. Additionally, security keys and Midway PINs are simply tools to allow employees to securely access the Amazon network and certain resources—and

employees use them both *in the office* and outside of the workplace.  Ex. S (Monem) at 10:19-11:14; Ex. Y (Situ) at 14:12-22; Ex. B at 35:7-36:1.  Thus, having a security key or PIN does not indicate whether an employee was working, or could work, remotely.  Ex. B at 35:7-36:1.[10]

Plaintiff next points to the fact that Amazon permitted fully remote employees (who were never assigned to any physical office location and thus had no option to come into an office), to seek reimbursement of internet expenses up to $50 per month as supposed evidence that Amazon had "knowledge" that *other* employees who worked remotely were incurring home internet expenses, too.  Mot. at 10 n.6.  Plaintiff's argument falsely equates fully virtual employees and the employees in the putative class.  Even if it were, in certain circumstances, reasonable to infer a fully remote worker without an assigned office was incurring monthly internet expenses, the same inference does not follow for employees who had the choice to work from their office or at home.

Finally, there is no classwide evidence that Amazon actually *had* actual or constructive knowledge that every member of the putative class was necessarily incurring monthly home internet expenses to work for Amazon, much less the amounts of those expenses.  *See Wilson*, 2010 WL 5059522, at *4.  Where, as here, an employer permitted reimbursement of the expenses in question, and the employee offered no separate evidence that the defendant knew every time an employee incurred business expenses, there is no basis to extend *Stuart* as Plaintiff wishes.  *See Wilson*, 2010 WL 5059522, at *5 (rejecting argument that lack of automatic reimbursement

---

[10] Plaintiff also relies on the Court's June 1, 2022 order on Amazon's Motion to Dismiss, claiming this Court categorically recognized that "Amazon had reason to know its corporate office employees were working from home and Amazon knew or should have known they would need home internet to do so."  Mot. at 12 n.10 (citing Dkt. 25 at 2).  Yet, the Order simply states it was plausible to infer, at the pleadings stage, that Amazon knew or had reason to know "its software development engineers who worked from home during the pandemic were incurring basic costs related to that work."  Dkt. 25 at 2.  This in no way implies Amazon knew *all* corporate employees in California were working remotely or that all corporate employees working remotely would specifically need internet to do so, much less the particulars of their unique circumstances.

mechanism amounted to illegal uniform policy).[11]

###### C.    The Individualized Liability Issues Cannot Be Managed

In addition to failing to establish commonality and predominance, Plaintiff's motion fails to address the "likely difficulties in managing" class litigation on these claims, either as to liability or damages.  Fed. R. Civ. P. 23(b)(3)(D).  Plaintiff proposes to manage any individualized issues by bifurcating trial into liability and damages phases.  Mot. at 25.  But that presupposes that the liability issues can themselves be managed.  The very sources Plaintiff cites—Amazon's supposed "policies," job descriptions, and Ms. Steiner's "preliminary" survey—show why that is not the case.  Amazon's reimbursement guidance calls for one-on-one conversations between employees and managers (Ex. L), and testimony confirms that the guidance, as actually applied in practice, was interpreted differently by teams and individuals.  Ex. P at 20–22.  And as discussed at length above, each element of section 2802 presents individualized liability issues.  For these reasons, the superficial analysis of job descriptions or titles or the time period of employment that Plaintiff proposes is insufficient to account for the wide variety of reasons employees did or did not use their home internet or claim reimbursement for it, each of which bears on damages and liability.

Ms. Steiner's "preliminary" survey (in addition to being deeply—and in many cases incurably—flawed (*see* Declaration of Kristen Backor ("Backor") at 3–4), confirms why the individual inquiries in this case are not manageable.[12]  Ms. Steiner's survey consisted of 16

---

[11] As Amazon has noted before (Dkt. 19 at 7), it is *not* arguing at this stage that employees must exhaust Amazon's reimbursement process to press a claim under section 2802.  Plaintiff's contention that Amazon's "waiver" or "exhaustion" defense presents a common question is therefore misplaced and irrelevant.

[12] Because Plaintiff has specifically disclaimed seeking to admit Ms. Steiner's survey at this stage (Mot. at 12), Amazon has not moved to exclude it under *Daubert v. Merrell Down Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), but reserves all rights to do so should Plaintiff seek to admit it, or a "final" version, later in the case.  Further, to the extent Plaintiff seeks to admit his badge-swipe analysis, attached as Exhibit A to the Declaration of David Williams, as expert

questions asking, essentially, how much the respondent's internet bill was generally (not how much they personally spent on internet) and whether they sought reimbursement for that bill. *See* Dkt. 40-4 (Steiner) at 23–27. Many respondents' answers align with the evidence Amazon itself has elicited—for example, that employees lived and worked outside California for extended periods of time; had internet paid for by others; had a varied understanding of Amazon's reimbursement guidance; and had different remote work practices. *See generally* Ex. P. More fundamentally, as Dr. Backor's rebuttal report shows, the kinds of questions that need to be asked to determine liability in this case cannot credibly be asked through any survey, and certainly not the one Ms. Steiner ran or proposes to run. Backor at 8–16. *Bowen* is instructive. There, plaintiffs also proposed a survey to determine whether using personal cell phones was necessary. 2021 WL 4860690, at *10. Those plaintiffs submitted an expert report—also authored by Ms. Steiner— which sought to model damages on a classwide basis based on a random sample survey. *Id.* The court declined to certify the class on predominance grounds, finding that Ms. Steiner's survey— which, similar to this one, proposed to ask whether employees were aware of the policy at issue, how frequently and for how long they used their devices, what tasks they completed on their devices, and the costs of their data plans—"cannot solve . . . the difficult question of determining under what circumstances a[n] . . . employee's cell phone use is 'necessary' or even reasonable." *Id.* at *11. The same is true here: Given how differently situated employees were, it would be "exceedingly difficult" to gauge their motivations and the feasibility of an Amazon-provided alternative on any given occasion. *Bowerman*, 39 F.4th at 662.

Although Plaintiff asserts that badge swipe data demonstrates "months worked in

---

testimony, Amazon also reserves its rights to move to exclude such testimony. *Cf. Daubert v. Merrell Dow Pharms.*, 43 F.3d 1311 (9th Cir. 1995).

Amazon's offices" that can be deducted from the total pay periods (Mot. at 15), that data does not provide a classwide answer to the fundamental question of whether use of home internet was necessary or reasonable either. One cannot assume, simply because an employee did not swipe into the office, that remote work was "necessary" on that day or required by Amazon—or even that an employee did not in fact come to the office. The evidence shows many employees fully understood they could go into the office but chose not to for personal reasons or for reasons not dependent on Amazon. *See* p. 16, *supra*; *Novak*, 2011 WL 9160940, at *3. The evidence also shows employees' patterns of office attendance were often correlated with factors external to Amazon, such as the availability of vaccines or the presence of new COVID variants. Ward at 8. And finally, not all ingress and egress may be accurately reflected in the data, as certain badges show an entry without an exit, or vice versa. Ward at 6.

Similarly, one cannot assume every time an employee swiped into the office, they *were* working in-office. Some may have only visited in order to retrieve belongings, for example. Ward at 5–6. In other words, badge swipe data cannot be used to identify uninjured class members, and thus does not cure the manageability problem in Plaintiff's proposed class. *Bowerman*, 39 F.4th at 662; *Olean*, 31 F.4th at 669 n.14; *cf. Wilson v. Skywest Airlines, Inc.*, No. 19-CV-1491-VC, 2022 WL 1601410, at *1 (N.D. Cal. Jan. 31, 2022) (no predominance when examination of each employee's record is necessary for liability and damages).

What's more, Plaintiff must also prove that "damages resulting from [his] injury [are] measurable 'on a classwide basis' through use of a 'common methodology.'" *Comcast*, 569 U.S. at 30. Even if the presence of individualized damages may not itself defeat certification, here, damages *do* pose significant obstacles to the manageability of Plaintiff's claims on a classwide basis. *Bowerman*, 39 F.4th at 662; *Harris v. Vector Mktg. Corp.*, 753 F. Supp. 2d 996, 1023 (N.D.

Cal. 2010).    Plaintiff attempts to deal with these issues by proposing different methods of calculating a flat reimbursement rate across the class, ranging from $50 (aligned with the amount Amazon permitted virtually designated employees to seek) to $115.22 (aligned with the expenses Plaintiff himself claimed to have had).    Ex. D at 224:12-16.    Even if damages calculations need not be exact, simply picking one of these amounts would raise significant concerns for Amazon and the absent class members, as it would alter the substantive law of section 2802 in violation of the Rules Enabling Act.    *Dukes*, 564 U.S. at 367.    The evidentiary record shows wide variation in the amount putative class members were paying for internet: not only does Plaintiff claim to have incurred an amount well above the range of other putative class members, but also numerous putative class members, including multiple respondents in Ms. Steiner's limited survey pool, incurred *no expense* at all.    Ex. P at 14.    As such, it would be improper to assume a flat amount of damages for the entire class—and for some, to assume damages at all.

Plaintiff has failed to show that "'damages are capable of measurement on a classwide basis,' in the sense that the whole class suffered damages traceable to the same injurious course of conduct underlying the plaintiff's legal theory."    *Bowerman*, 39 F.4th at 663.    Here, even if class members could offer evidence of their monthly internet bills (which may vary for an individual over time, Ex. P at 16–18), there is no manageable way to determine on a classwide basis what *reasonable proportion* of those bills ought to be attributed to work for Amazon given the variation in class member preferences, work hours, and personal circumstances, including sharing internet with members of their household.    Ex. P at 14–15 (multiple putative class members splitting internet with roommates or live-in partner).    Putative class members are not automatically entitled to 100% reimbursement under section 2802 simply because they sometimes use their personal internet for work-related reasons.    *Cf. Tehrani*, 2016 WL 1559085, at *8; pp. 17–18, *supra*.

Plaintiff offers no method that traces which "damages stemmed from the defendant's actions that created the legal liability" (*Vaquero v. Ashley Furniture Indus.*, 824 F.3d 1150, 1154 (9th Cir. 2016))[13] and his proposal to try this claim in a bifurcated proceeding on behalf of almost 7,000 people is unmanageable.[14]

### D.    Plaintiff Is Neither A Typical Nor Adequate Class Representative

Even if Plaintiff could demonstrate that his claims are otherwise certifiable, he is not a typical or adequate representative to pursue those claims on behalf of others.  To satisfy typicality, Plaintiff must "possess the same interest and suffer the same injury as the class members."  *Dukes*, 564 U.S. at 348–49 (cleaned up).  This inquiry is often merged with the element of adequacy. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

To the extent Plaintiff's proposed class consists of individuals who were required to work remotely principally in California and had jobs capable of being done fully remotely, he is neither a typical nor adequate representative for numerous reasons, including that he chose to set up his home office in a converted garage where his preexisting internet did not reach; never asked if he could obtain a badge, and claimed he could not go into the office at all, even though others assigned to his office did; did not submit a single reimbursement request supposedly because his manager

---

[13] As discussed in footnotes 7 and 8, Plaintiff cannot use Amazon's goodwill in reimbursing for entire internet bills to paper over the individual inquiries necessary under California law or to suggest that Amazon has obligations beyond those required by section 2802.  In addition, Amazon's reimbursement data does not always clearly reflect the particular expenses for which employees seek reimbursement.  *See, e.g.*, Ward at 9–10.  Nor has Plaintiff established how to assess damages where employees have already been reimbursed for more than a "reasonable percentage" or the portion incurred as a "direct consequence" of their employment duties.

[14] For many of the reasons articulated in this section, Plaintiff's PAGA claim is not manageable, either.  While *Hamilton v. Wal-Mart Stores, Inc.*, 39 F.4th 575, 590–91 (9th Cir. 2022), held that PAGA does not contain a manageability requirement, Amazon reserves its right to raise this issue at a later date, pending resolution of *Estrada v. Royalty Carpet Mills, Inc.*, 76 Cal. App. 5th 685 (2022) and *Wesson v. Staples the Office Superstore, LLC*, 68 Cal. App. 5th 746 (2021) by the California Supreme Court, and otherwise reserves all rights to challenge the viability of Plaintiff's PAGA claim at a later date.

told him that he could not; and attempted to relocate to the United Kingdom.  *See* p. 16, *supra*.  These personal circumstances raise unique issues and defenses relevant to Plaintiff's section 2802 claim, such as whether the additional internet line he chose to install was necessary to perform his job duties; whether he could have worked from the office had he bothered to get a badge; whether Amazon knew or should have known he was incurring an expense in the absence of a reimbursement request; and what kinds of information he received from his managers about reimbursement, the latter of which Amazon would be entitled to test through cross-examination.  These issues could easily become the focus of the litigation and distract from the claims of the putative class.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (typicality not satisfied if the named plaintiff would be "preoccupied with defenses unique to" him).  Plaintiff therefore cannot demonstrate he "possess[es] the same interest and suffer[ed] the same injury as the class members."  *Dukes*, 564 U.S. at 348–49 (cleaned up); *cf. Wilson*, 2010 WL 5059522, at *5 (plaintiff who failed to submit reimbursement requests, although she had not been told she could not do so, was deemed atypical of section 2802 putative class).

### V.    CONCLUSION

For the foregoing reasons, Plaintiff's motion to certify the putative class should be denied.

Dated: December 21, 2022            GIBSON, DUNN & CRUTCHER LLP

By:  _____
Lauren M. Blas
*Attorney for Defendant*
*Amazon.com Services LLC*